IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |  |
|---|---|---|---|
| CHERYL F. COHENS, | * | | |
| Plaintiff, | * | | |
| v. | * | | CIVIL NO.: WDQ-11-3419 |
| STATE OF MARYLAND DEPARTMENT | * | | |
| OF HUMAN RESOURCES, *et al.*, | * | | |
| Defendants. | * | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Cheryl F. Cohens[1] sued the Maryland Department of Human
Resources (the "DHR")[2] for employment discrimination, in
violation of Title VII of the Civil Rights Act of 1964 ("Title
VII"),[3] the Equal Pay Act of 1963 (the "EPA"),[4] the Maryland
Equal Pay Act (the "MEPA"),[5] and Title 20 of the State Government
Article of the Maryland Code ("Title 20")[6]. Pending is Cohens's
motion for reconsideration of the Court's order denying her

---

[1] Cohens was initially represented by counsel, but has proceeded
*pro se* since August 9, 2012. ECF Nos. 20, 21.

[2] Cohens also sued the Baltimore City Department of Social
Services, which is part of the DHR. *See* ECF No. 6-1 at 1 n.1;
*see also* Md. Code Ann., Hum. Servs. §§ 2-301, 3-201.

[3] 42 U.S.C. §§ 2000e, *et seq.*

[4] 29 U.S.C. § 206(d).

[5] Md. Code Ann., Lab. & Empl. §§ 3-301, *et seq.*

[6] Md. Code Ann., State Gov't §§ 20-601, *et seq.*

motion for summary judgment on the equal pay claims, and

granting the DHR's cross motion for summary judgment on those

claims; also pending is the DHR's motion for summary judgment on

Cohens's remaining Title VII and Title 20 claims for race- and

sex-based discrimination. For the following reasons, Cohens's

motion for reconsideration will be denied; the DHR's motion for

summary judgment on the remaining claims will be granted.[7]

I. Background[8]

Cohens, an African-American woman, was hired as an

Administrative Officer II at the DHR on November 4, 1993.

Compl. ¶ 6. On November 30, 1994, she was promoted to

---

[7] Cohens has also moved "for obstruction of justice and
proceedings." ECF No. 42. The motion is substantively
identical to her later-filed motion "for sanctions and relief,"
ECF No. 49, which U.S. Magistrate Judge Susan K. Gauvey denied
in a detailed April 19, 2013 order. *See generally* ECF No. 58;
*id.* at 7 n.1. (Cohens has not challenged Judge Gauvey's
decision. *See* docket.) The pending motion differs principally
in that it asserts, as legal bases for relief, violations of 18
U.S.C. §§ 1505, 1509, and 1519, and Federal Rules of Evidence
607 and 608. *Compare* ECF No. 42, *with* ECF No. 49.

To the extent Cohens's motion for obstruction of justice
asserts the same misconduct and seeks the same relief as her
motion for sanctions, the motion will be denied for the reasons
stated by Judge Gauvey. *See* ECF No. 58 at 7-18. To the extent
Cohens's motion asserts new bases for relief, the motion will be
denied because a civil litigant cannot allege violations of
criminal law, and--this case being at the summary judgment
stage--credibility determinations are premature. *See Linda R.S.
v. Richard D.*, 410 U.S. 614, 619 (1973); *Dennis v. Columbia
Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

[8] In reviewing a motion for summary judgment, the nonmovant's
evidence "is to be believed, and all justifiable inferences are
to be drawn in h[er] favor." *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986).

2

Administrative Officer III.  *Id.*; *see* McMahan Decl. at 24 ¶ 10.[9]
On July 27, 2005, Frank Valenti, a white man, hired Cohens to
work in the DHR's training unit ("HRDT").  McMahan Decl. at 24 ¶
9.[10]

Three male trainers and another female trainer worked in
HRDT.  *See* McMahan Decl. at 22-24 ¶¶ 5-8; ECF No. 28 at 2.  The
other members of HRDT were Doctor Marian Davis-Foster, an
African-American woman; Osceola Edmondson, an African-American
man; Ron Forbes, a white man; and Barry Simon, a white man.
McMahan Decl. at 22-24 ¶¶ 5-8.[11]  Edmondson possesses a bachelor

---

[9] "McMahan" is Jennifer McMahan, Director of HRDT.  McMahan Decl.
at 22 ¶¶ 2-3.

[10] Cohens retained the same classification, salary grade, and
step when she was assigned to HRDT.  McMahan Decl. at 24 ¶ 10.
According to McMahan, "[i]t is an established practice that[,]
when [an employee is] reassigned and transferred to another
agency, [she] retains the same [position identification number,
or "PIN"], same pay grade[,] and [same] step even if the new
position's appropriate classification was at a lower level."
*Id.* at 24-25 ¶ 13.  Cohens's duties and responsibilities also
did not change during her tenure at HRDT, and were "consistent
with the position specifications for an Administrative Officer
III."  *Id.* at 24 ¶ 10.

[11] According to the members' respective MS-22 Position Descript-
ions, Edmondson was an "Administrator V," with the working title
of "Deputy Director--HRDT-Training Unit"; Forbes was a "Program
Manager II," with the working title of "Leadership Development
Program Admin., HRDT-Training Unit"; and Simon was an
"Administrator II," with the working title of "E-Learning
Coordinator."  ECF No. 27 at 37, 45, 53.

of science in business and a masters in public administration;[12]
Forbes possesses a bachelor of science and a masters in
education;[13] and Simon possesses a bachelor of science in
business administration[14]. *Id.* ¶¶ 6-8. Cohens did not obtain a
college degree. *See* Cohens Dep. at 61 (31:14-17, 32:6-9).
Cohens testified she "didn't know" whether the other HRDT
members had received more training than her, but believed that
she had more experience than them in "some areas." *Id*. at 61
(31:18-21, 32:9-12).[15]

From September 2008 to March 2009, Cohens was on medical
leave for a non-work related injury. ECF No. 46, Ex. A
[hereinafter, "Discrimination Charge"]. When she returned, she

---

[12] Edmondson has taught business courses at Howard Community
College. McMahan Decl. at 23 ¶ 6. As of August 30, 2012,
Edmondson had worked for the State of Maryland for 23 years.
*Id.*

[13] Forbes also has certificates in management in the "Public
Service System" and "General Public Procurement," and has taught
at Essex Community College and McDaniel College. McMahan Decl.
at 23 ¶ 7. As of August 30, 2012, Forbes had worked for the
State of Maryland for more than 35 years. *Id*.

[14] Simon is also a "Dale Carnegie Certified Instructor" in three
courses. McMahan Decl. at 24 ¶ 8. As of August 30, 2012, Simon
had worked for the State of Maryland for 35 years. *Id*.

[15] In response to interrogatories, the DHR asserted that "all the
employees within the HRDT Training Unit had duties similar to
Ms. Cohens, including the responsibility to conduct trainings,"
but noted that "each of the other employees . . . had additional
education, skills, training, and experience than [sic] Ms.
Cohens and was therefore assigned work according to those
skills, experience, and training." ECF No. 28-4 at 1 (Interrog.
No. 14).

"began to be subjected to disparate treatment and unequal terms and conditions of employment." *Id.* In March 2009, Cohens learned that she was being paid between $25,000 and $30,000 less per year than the white or male trainers. Compl. ¶ 8.[16] She "expressed her disappointment and concerns of discrimination and pay disparity with Valenti," but her pay remained the same. *Id.* ¶ 9. The "incident" "heightened" "disparities" that "were occurring"[17] in the training unit. *Id.* For instance, Cohens

---

[16] As of September 2009, Edmondson was a Grade 20, Step 18, and was paid $79,818; Forbes was a Grade 20, Step 17, and was paid $78,325; and Simon was a Grade 17, Step 16, and was paid $63,226. McMahan Decl. at 23 ¶¶ 6-8. As of September 29, 2009, Cohens was a Grade 15, Step 14, and was paid $53,439. ECF No. 27 at 81.

[17] Cohens alleges that, throughout her employment at HRDT, she was "held to a stricter work schedule" than her male co-workers, who would "hang[] around talking about non-work events" while she was working. Compl. ¶ 25 (internal quotation marks omitted). She testified:

> [T]here was just a tone set there where the males in the office were very care-free. They looked comfortable. They seemed pretty happy in their jobs. They walked around and they interacted with each other all day, throughout the day. They didn't seem to be accountable for much.
>
> And then on the other hand, the environment and the atmosphere and the climate for the women in that particular office is that they always seemed afraid, like somebody was watching them, like they were always rushed with lunch hours or being on the telephone. Like lots of times you saw the men walking around. They would have their cellphones. They would talk on their cell phones. They would get up and leave their desks and go in the hallway to talk on their cellphones.

5

"was only allowed to do local trainings," and was given "old dirty cars to drive to her trainings," whereas her male co-workers were allowed to attend statewide training events" and were given "clean, newer cars" and cell phones. *Id.*; *see also* Cohens Dep. 171-72.[18] Valenti refused to allow Cohens to be the keynote speaker for an event, despite the organizers' request that Cohens speak. Compl. ¶ 10. Valenti recommended a male speaker. *Id.*

On or about June 8 and 19, 2009, Cohens met with Valenti to discuss problems with her work ethic, including communication, tardiness, time-sheet preparation and documentation, and leave

---

And the women weren't really privileged. They were not privileged to do that. They had their cellphones off at work. They were afraid to talk on the phones for long periods of time.

Cohens Dep. 163-64.

Cohens also alleges that Valenti frequently referred to female employees as "sweetie," and "often" remarked on Cohens's "appearance and lipstick." Compl. ¶ 26.

Davis-Foster stated that she "never" felt afraid to talk on the phone or that she was being watched. Davis-Foster Decl. ¶ 7.

[18] According to Edmondson, employees reserve State cars on the Administrative Services Intranet website. Edmondson Decl. ¶ 4. The employee selects the size of the car and states the trip's purpose, destination, and anticipated return date. *Id.* There is "no noticeable pattern" as to which cars are assigned. *Id.* ¶ 3. Edmondson has been assigned cars that were "less than clean and even in disrepair." *Id.* ¶ 5. Once, one of the car doors was held together by duct tape, and fell off its hinges when Edmondson arrived at his destination. *Id.* Edmondson asserts that neither he nor any other trainer was provided a State-issued cell phone. *Id.* ¶ 3.

management. *See* ECF No. 46, Ex. D. Sometime before July 2009, Cohens "broke down in tears in Valenti's office" and told him that the work environment was "difficult" for her. Compl. ¶ 11; *see* ECF No. 10-1 at 4 n.6. Cohens's co-workers knew that she was terrified of mice, and "[s]omeone [had] put mousetraps in her office." Compl. ¶ 11; Cohens Dep. 140:17-21. Cohens's training schedule had also been reduced "with no explanation." Compl. ¶ 11. Cohens told Valenti that she "needed to take a leave of absence because of her mental state regarding work depression." *Id.* Valenti allegedly told Cohens "she had to be a good girl" to get her leave approved, and "someone in [m]anagement was trying to terminate her." *Id.*

On July 11, 2009, Cohens submitted a letter of resignation to Valenti, effective September 29, 2009. ECF No. 46, Ex. E. The letter explained Cohens's desire to "embark upon new endeavors in [her] professional life." *Id.* Cohens thanked Valenti for "the host of experience" she would take with her. *Id.* On September 29, 2009, Cohens gave Valenti a personal card, which stated, in full:

> You were one of the most dynamic supervisors that I've been fortunate enough to meet in my years of service here. You have allowed me to grow to the point of where I am professionally as a trainer. You will be missed. And I want you to know that I appreciate all you've done for me. Good luck with your surgery and God bless you. I am sorry that I could not commit to "State Rules + Regs." Hopefully I will land at a place that doesn't require as much. God bless +

Thanks!

ECF No. 46, Ex. F.[19]

In October and November 2009, Cohens wrote to then-DHR Secretary Brenda Donald to complain about difficulty retrieving her personal belongings. ECF No. 46, Exs. G, I. Neither letter included allegations of discrimination. *See id.*

On December 15, 2009, Cohens submitted an intake questionnaire to the U.S. Equal Employment Opportunity Commission (the "EEOC"), alleging race and sex discrimination and retaliation. ECF No. 15-2 at 3. On March 2, 2010, Cohens filed a charge with the Maryland Commission on Human Relations (the "MCHR") and the EEOC, alleging race and sex discrimination and unequal pay. Discrimination Charge. On August 12, 2011, Cohens received a right-to-sue letter. Compl. ¶ 2.

On September 30, 2011, Cohens sued in the Circuit Court for Baltimore City, Maryland, alleging race and sex discrimination and retaliation, in violation of the EPA (Count One), the MEPA (Count Two), Title VII (Count Three), and Title 20 (Count Four). ECF No. 2. On November 28, 2011, the DHR removed the lawsuit to this Court. ECF No. 1.[20] On December 5, 2011, the DHR moved to

---

[19] Cohens admits that her letter of resignation and thank you card to Valenti were written voluntarily. *See* Cohens Dep. 158-59.

[20] The complaint and summons were not served on the DHR until November 1, 2011. ECF No. 1 at 1.

dismiss Cohens's retaliation claim, and for summary judgment on all other claims. ECF No. 6; ECF No. 6-1. On December 20, 2011, Cohens opposed the motion. ECF No. 10. On May 11, 2012, this Court granted in part and denied in part the DHR's motion to dismiss and for summary judgment. ECF No. 12.[21]

On May 24, 2012, Cohens moved for reconsideration of the dismissal of her retaliation claims. ECF No. 15. On June 14, 2012, the DHR opposed the motion for reconsideration. ECF No. 18. On August 8, 2012, Cohens's counsel moved to withdraw. ECF No. 19. On August 9, 2012, this Court granted counsel's motion. ECF No. 20. That day, Cohens indicated she would proceed *pro se*. ECF No. 21.

On August 16, 2012, Cohens moved for summary judgment on her equal pay claims. ECF No. 23; *see* ECF No. 23-1 at 3. On September 6, 2012, the DHR opposed Cohens's motion and cross moved for summary judgment. ECF No. 27. On September 10, 2012, Cohens opposed the DHR's cross motion and replied in support of her motion for summary judgment. ECF No. 28. On September 17, 2012, the DHR replied. ECF No. 29. On September 25, 2012,

---

[21] The Court dismissed Cohens's Title VII retaliation claim--as well as any implied retaliation claim under Title 20--for lack of subject matter jurisdiction, on the grounds that Cohens had not administratively exhausted that claim. ECF No. 11 at 10-11 & n.14; ECF No. 12. The Court denied summary judgment on the remaining claims, in light of Cohens's counsel's unopposed Rule 56(d) affidavit seeking further discovery. ECF No. 11 at 13; ECF No. 12.

Cohens filed a surreply. ECF No. 35.

On September 20, 2012, Cohens moved to amend the memorandum in support of her motion for summary judgment. ECF No. 31. On September 27, 2012, the DHR opposed Cohens's motion to amend. ECF No. 37. On October 4, 2012, Cohens replied. ECF No. 40.

On October 22, 2012, Cohens moved "for obstruction of justice and proceedings." ECF No. 42. On October 31, 2012, the DHR opposed Cohens's motion. ECF No. 43. Cohens timely replied. ECF No. 48. On November 1, 2012, the DHR moved for summary judgment on Cohens's remaining Title VII and Title 20 claims. ECF No. 45. On November 15, 2012, Cohens opposed the DHR's motion for summary judgment. ECF No. 50. The DHR has not replied. *See* docket.

On March 19, 2013, the Court granted in part and denied in part Cohens's motion for reconsideration[22]; granted Cohens's motion to amend; denied Cohens's motion for summary judgment on her equal pay claims; granted the DHR's cross motion for summary judgment on the equal pay claims; and dismissed Counts One and Two of the complaint. ECF No. 55.[23] On April 17, 2013, Cohens moved for reconsideration. ECF No. 57. On April 29, 2013, the

---

[22] The motion was granted as to reconsideration, but denied on the merits. ECF No. 55.

[23] Cohens's Title VII and Title 20 claims for sex- and race-based disparate treatment and hostile work environment remain. *See* Compl.; ECF No. 11.

DHR opposed Cohens's motion for reconsideration. ECF No. 59.
Cohens has not replied. *See* docket.

II. Analysis

Because Cohens is a *pro se* litigant, her filings will be
construed liberally, even if her arguments and pleadings are
"inartful[]." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per
curiam) (internal quotation marks omitted).

A. Cohens's Motion for Reconsideration (ECF No. 57)

1. Legal Standard

Motions for reconsideration of an interlocutory order are
governed by Fed. R. Civ. P. 54(b), under which "any order . . .
may be revised at any time before the entry of a judgment
adjudicating all the claims and all the parties' rights and
liabilities." Fed. R. Civ. P. 54(b).[24] Thus, when warranted, a
district court retains the power to reconsider and modify its
interlocutory judgments at any time before final judgment. *Am.
Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th
Cir. 2003).[25] Resolution of the motion is "committed to the

---

[24] *See Mateti v. Activus Fin., LLC*, No. DKC-08-0540, 2009 WL
3633339, at *4 (D. Md. Oct. 27, 2009).

[25] "Motions for reconsideration of interlocutory orders are not
subject to the strict standards applicable to motions for
reconsideration of a final judgment." *Am. Canoe*, 326 F.3d at
514 (*citing* 11 James Wm. Moore et al., *Moore's Federal Practice*
§ 56.04[3] (3d ed.) ("Rule 60(b) does not govern relief from
interlocutory orders . . . .")); *see also Fayetteville Investors
v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir.

discretion of the district court," *id.* at 515, and "the goal is to reach the correct judgment under law." *Netscape Commc'n Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 547 (E.D. Va. 2010) (internal citations omitted).

Although Rule 60(b) applies only to final judgments, a court may consider the reasons in that rule when deciding whether to grant relief under Rule 54(b).[26] *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1470 (4th Cir. 1991); *Mateti*, 2009 WL 3633339, at *4.

2. The Merits

Cohens asks the Court to reconsider the grant of the DHR's motion for summary judgment on her equal pay claims, and denial of her motion for summary judgment on those claims, because "new evidence" shows the DHR's merit-system defense was pretextual. *See* ECF No. 57 at 1. The DHR argues that Cohens's motion is

---

1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment.").

[26] Under Rule 59(e), a motion to alter or amend a final judgment may be granted only "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Under Rule 60(b), a court may grant relief from a judgment or order for: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or misconduct by the opposing party; (4) voidness; (5) satisfaction; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b).

untimely under Local Rule 105.10,[27] and her motion fails to raise either new arguments or evidence sufficient to warrant reconsideration. ECF No. 59 ¶¶ 3, 5.

A court's discretion to review an interlocutory order is "not subject to the strict standards applicable to motions for reconsideration of a final judgment,"[28] but is "within the plenary power of the Court . . . to afford such relief . . . as justice requires."[29] Although Rules 59(e) and 60(b) do not govern reconsideration of an interlocutory order, the Fourth Circuit has suggested that at least parts of those rules may guide a court's analysis.[30] In considering whether to revise interlocutory decisions, district courts in this circuit have

---

[27] Under the Rule, "[e]xcept as otherwise provided in Fed. R. Civ. P. 50, 52, 59, or 60, any motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order." Local Rule 105.10 (D. Md. 2011).

[28] *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003).

[29] *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1473 (4th Cir. 1991) (internal citation and quotation marks omitted).

[30] *See Fayetteville Investors*, 936 F.2d at 1470, 1472; *Pritchard v. Wal-Mart Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001) (per curiam); *see also Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298, 332-39 (D. Md. 2000) (guided by Rules 59(e) and 60(b), court declined to amend interlocutory order because movant had presented no new facts and had failed to show that other cases dictated a different result).

13

looked to whether movants presented new arguments[31] or evidence,[32] or whether the court has "obviously misapprehended a party's position or the facts or applicable law."[33]

Cohens argues that reconsideration is warranted in light of a newly submitted, undated declaration, in which she asserts her competency to testify about the DHR's merit system; personnel history showing she was paid less than Edmondson (Cohens Decl., Ex. 1); certain of the DHR's answers to interrogatories,[34] as well as a diagram showing the other trainers' respective position titles (Cohens Decl., Ex. 2); the job description for Edmondson's position (Administrator V) (Cohens Decl., Exs. 3, 4); and two pages from Davis-Foster's deposition (Cohens Decl., Ex. 4).

In addition to not being "newly discovered," none of the above evidence warrants a change in the Court's decision. As an

---

[31] *See, e.g.*, *McLaurin v. E. Jordan Iron Works, Inc.*, 666 F. Supp. 2d 590, 596 (E.D.N.C. 2009) ("Generally, motions to reconsider are not appropriate vehicles to advance arguments already rejected by the Court or new legal theories not argued before the ruling.") (internal quotation marks omitted)), *aff'd*, 410 F. App'x 630 (4th Cir. 2011).

[32] *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 474 (M.D.N.C. 2003).

[33] *Duke Energy Corp.*, 218 F.R.D. at 474 (internal quotation marks omitted).

[34] Cohens submitted the same answers in support of her memorandum in opposition to the DHR's cross motion for summary judgment. ECF No. 28, Ex. 4.

initial matter, the DHR has never disputed that Cohens was paid less than her male co-workers. However, as the Court explained in its March 19, 2013 memorandum opinion, Cohens failed to establish a prima facie violation of the EPA or MEPA because she did not show that her job required virtually identical skills, efforts, and responsibilities. ECF No. 54 at 20-26. None of the evidence accompanying Cohens's motion refutes this conclusion. Nor does it contest the Court's conclusion that, even assuming Cohens had established a prima facie case, the salary differential was justified by these differences in qualifications, as well as the State's merit system. *See id.* at 27-30. Cohens has not produced any admissible evidence to suggest that the DHR's proffered justification was pretextual.[35] Instead, Cohens reiterates the same arguments--which the Court considered and rejected--about the DHR's alleged noncompliance with the merit system's evaluation procedures. ECF No. 57 at 6-10; *see* ECF No. 54 at 28-29.

Cohens's motion for reconsideration will be denied.

---

[35] Citing Exhibit 3 to her declaration, Cohens insists that "[d]iscovery" revealed she was qualified to work in the same job classification as Edmondson. ECF No. 57 at 4. However, the evidence demonstrates the contrary: according to the description, the Administrator V position requires a bachelor's degree, which Cohens has admitted she does not hold. *See* Cohens Dep. 31:14-17.

B. The DHR's Motion for Summary Judgment (ECF No. 45)

1. Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[36] In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

---

[36] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

2. The Merits

Title VII prohibits employers from "discriminat[ing] against any person with respect to h[er] compensation, terms, conditions, or privileges of employment," because of the person's race or sex. 42 U.S.C. § 2000e-2(a). To prove Title VII discrimination, a plaintiff must provide direct evidence of a Title VII violation, or proceed under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas*, 411 U.S. at 802-04 (disparate treatment); *Kaszynski v. Thompson*, 83 F. App'x 526, 527-28 (4th Cir. 2003) (per curiam) (hostile work environment). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case that raises an inference of illegal conduct. 411 U.S. at 802. The burden then shifts to the defendant to articulate a legitimate, lawful reason for its actions. *Id.* The plaintiff, in turn, must demonstrate that the employer's proffered explanation is a pretext for discrimination. *Id.* at 804.

"The elements of a prima facie case vary depending on the form of discrimination alleged." *Jenkins v. Balt. City Fire Dep't*, No. SKG-10-125, 2012 WL 1109730, at *12 (D. Md. Mar. 30, 2012). Here, Cohens has alleged disparate treatment[37] and

---

[37] The complaint also alleges that Cohens was constructively discharged. Compl. ¶ 29(b). The DHR argues that Cohens has

17

hostile work environment on the basis of race and sex.  The

Court will address each claim.[38]

      a. Disparate Treatment

To establish a prima facie case of disparate treatment, a

plaintiff must show "(1) membership in a protected class; (2)

satisfactory job performance; (3) adverse employment action; and

(4) different treatment from similarly situated employees

outside the protected class." *Coleman v. Md. Ct. of App.*, 626

F.3d 187, 190 (4th Cir. 2010).  "Adverse employment actions

include decreases in pay or benefits and discharge, including

constructive discharge." *Banhi v. Papa John's USA, Inc.*, No.

RWT-12-0665, 2013 WL 3788573, at *6 (D. Md. July 18, 2013).

---

failed to establish a constructive discharge "claim," entitling
it to summary judgment. *See* ECF No. 46 at 2, 15-17.
    Constructive discharge is not a standalone claim, but
rather "can satisfy the element of an adverse employment action
in a substantive claim." *Id.* (internal quotation marks
omitted); *see also Rosa v. Bd. of Educ. of Charles Cnty., Md.*,
No. 8:11-cv-02873-AW, 2012 WL 3715331, at *10 (D. Md. Aug. 27,
2012) ("Constructive discharge is not a claim per se."); *Reed v.
Action Prods., Inc.,* Civil No. 12-409-JKB, 2012 WL 2711051, at
*2 (D. Md. July 6, 2012) ("Constructive discharge . . . is not
an independent basis for relief, but [is] a legal fiction under
which an employee's voluntary resignation may be deemed a
termination by the employer.").  Thus, the Court will consider
Cohens's allegation that she was constructively discharged as
the alleged "adverse employment action" in her claim for
disparate treatment.

[38] Because Maryland courts routinely look to Title VII cases to
determine the scope of liability under Title 20, *e.g.*, *State
Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.*, 818 A.2d
259, 277 (Md. Ct. Spec. App. 2003), the Court's analysis under
Title VII applies with equal force to Cohens's Title 20 claim.

18

Constructive discharge occurs when an employee resigns because the "employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186-87 (4th Cir. 2004) (internal quotations omitted).[39]

Cohens--an African-American female--is a member of a protected class. The Court will assume, for this analysis, that Cohens has shown satisfactory job performance. As to the third element, Cohens alleges that working conditions were so distressful that "she felt no option but to resign from work." Compl. ¶ 12; *see also* ECF No. 50 at 1 (arguing that the DHR "subjected her to [a] hostile work environment, thereby constructively discharging her"). Specifically, Cohens states that her work schedule was more demanding than her male co-workers'; Valenti referred to Cohens and female co-workers as "sweetie"; and Valenti talked about Cohens's appearance while she was trying to discuss work-related matters. *See* Compl. ¶ 25. Cohens also asserts that she found mousetraps outside her office, and "everybody" knew she was afraid of mice. Cohens Dep. 140:17-21. However, such "[d]issatisfaction with work

---

[39] *See also, e.g.*, *Goldsmith v. Mayor & City Council of Balt.*, 987 F.2d 1064, 1072 (4th Cir. 1993) ("An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress." (internal quotation marks omitted)).

assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).[40]

That Cohens was not constructively discharged is supported by evidence that her resignation was voluntary. For instance, Cohens's July 11, 2009 resignation letter explained her planned departure as arising from a desire to "embark upon new endeavors in [her] professional life." ECF No. 46, Ex. E. On September 29, 2009--the effective date of her resignation and the day before the "latest" discriminatory act allegedly occurred-- Cohens gave Valenti a personal card, which contained, among other things, an apology for being unable to commit to "State Rules + Regs." ECF No. 46, Ex. F; Discrimination Charge. Because there is no evidence of a calculated effort to force Cohens's resignation, and ample evidence that Cohens's resignation was voluntary, Cohens has failed to establish

---

[40] *See also Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (plaintiff's allegations that her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and required her to work with an injured back--even if true--"d[id] not establish the objectively intolerable working conditions necessary to prove a constructive discharge").

constructive discharge. There is no evidence of any other
adverse action by the DHR.[41]

Because Cohens has not shown she was subjected to an
adverse employment action, the DHR is entitled to summary
judgment on her claim of disparate treatment.

b. Hostile Work Environment

To establish a prima facie case of hostile work environ-
ment, the plaintiff must show she was the subject of conduct
that was (1) unwelcome, (2) based on her race or sex, (3)
subjectively and objectively severe or pervasive enough to alter
her conditions of employment and create an abusive atmosphere,
and (4) imputable to the employer. *Spriggs v. Diamond Auto
Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001). "Establishing the
third element requires that the plaintiff show that the work
environment was not only subjectively hostile, but also
objectively so." *Bonds v. Leavitt,* 629 F.3d 369, 385 (4th Cir.
2011). In other words, a plaintiff must demonstrate that she

---

[41] To the extent that Cohens relies on her allegations that she
was denied clean cars and cell phones, she has failed to provide
evidence that this denial adversely affected her. *See* Compl. ¶
9. Cohens's allegation that she was "denied" statewide training
opportunities, and that her training schedule was reduced, *id.*
¶¶ 10-11; ECF No. 50 at 3--without any evidence that her salary
or other elements of employment status were thereby affected--
also does not suffice. *See, e.g.*, *Edwards v. EPA*, 456 F. Supp.
2d 72, 86 (D.D.C. 2006) ("[T]o be adverse, the denial of a
travel or training opportunity must have a discernible, as
opposed to a speculative, effect on the terms, conditions, or
privileges of one's employment.").

21

perceived the environment to be hostile, *and* that the conduct was such that a reasonable person in the plaintiff's position would have felt the same way. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).[42]

The standards for judging hostility are "sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). "In applying these factors, this Court has recognized that the standard for proving an abusive work environment is intended to be a very high one." *Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 864 (D. Md. 2004) (internal quotation marks omitted). Courts "usually only allow hostile work environment claims to proceed where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 776 (D. Md. 2010).

Here, the DHR concedes that Cohens was subjected to unwelcome conduct. *See* ECF No. 46 at 8. The DHR argues, however, that summary judgment is appropriate because Cohens has

---

[42] *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

failed to satisfy the second, third, and fourth elements of the prima facie case. *Id.* Because Cohens has failed to show that the conduct was objectively severe and pervasive, the Court need not consider whether it was based on race and sex and was imputable to the DHR.

Cohens's hostile work environment claim is based on the same assertions underlying her claim for constructive discharge: the work climate was more favorable to men; she was assigned dirtier cars than her male co-workers; she was not provided a State cell phone, unlike her male co-workers; Valenti referred to her and other female workers as "sweetie," and commented on her appearance and lipstick; and mousetraps were left outside her office. Compl. ¶¶ 11, 25-27. To determine whether the above misconduct was *objectively* severe,[43] the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sunbelt Rentals*, 521 F.3d at 315 (internal quotation marks omitted). Here, there is no allegation--much less evidence--that the conduct was "near constant," physically threatening, or interfered with Cohens's work performance. *Tawwaab*, 729 F. Supp. 2d at 776. Moreover,

---

[43] The DHR does not dispute that Cohens perceived her work environment to be hostile. *See* ECF No. 46 at 10-12.

failed to satisfy the second, third, and fourth elements of the prima facie case. *Id.* Because Cohens has failed to show that the conduct was objectively severe and pervasive, the Court need not consider whether it was based on race and sex and was imputable to the DHR.

Cohens's hostile work environment claim is based on the same assertions underlying her claim for constructive discharge: the work climate was more favorable to men; she was assigned dirtier cars than her male co-workers; she was not provided a State cell phone, unlike her male co-workers; Valenti referred to her and other female workers as "sweetie," and commented on her appearance and lipstick; and mousetraps were left outside her office. Compl. ¶¶ 11, 25-27. To determine whether the above misconduct was *objectively* severe,[43] the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sunbelt Rentals*, 521 F.3d at 315 (internal quotation marks omitted). Here, there is no allegation--much less evidence--that the conduct was "near constant," physically threatening, or interfered with Cohens's work performance. *Tawwaab*, 729 F. Supp. 2d at 776. Moreover,

---

[43] The DHR does not dispute that Cohens perceived her work environment to be hostile. *See* ECF No. 46 at 10-12.

the Court cannot conclude that the conduct was "severe" enough to be actionable under Title VII.[44]

Because Cohens has not shown that the alleged misconduct was so severe or pervasive as to alter her conditions of employment and create an abusive atmosphere, the DHR is entitled to summary judgment on her claim of hostile work environment.

III. Conclusion

For the reasons stated above, Cohens's motion for reconsideration will be denied; the DHR's motion for summary judgment on the remaining claims will be granted.

7/30/13
Date

William D. Quarles, Jr.
United States District Judge

---

[44] *Cf. Spriggs*, 242 F.3d at 184 (finding a race-based hostile work environment when plaintiff was "exposed on a 'continuous daily' basis" to the defendant's racist remarks about African-Americans).